J. BRADLEY COHN AND ELIZABETH R. COHN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Cohn v. Commissioner
Docket No. 12520-79.
United States Tax Court
T.C. Memo 1983-301; 1983 Tax Ct. Memo LEXIS 486; 46 T.C.M. (CCH) 286; T.C.M. (RIA) 83301; May 26, 1983. Michael D. Bray, for the petitioners. Norman A. Segal, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' Federal income taxes as follows: Calendar
Year
Deficiency
1971
$9,204.88
1972
7,412.73
1973
9,518.87
1974
9,543.46
1975
11,008.11
As a result of concessions made by petitioners, the sole issue remaining for decision is whether petitioners' operation of West River Lodge and Stable during calendar years 1971 through 1975 was an activity engaged in for profit. FINDINGS OF FACT Some of the facts have been stipulated *488 and are found accordingly. Petitioners J. Bradley Cohn and Elizabeth R. Cohn, husband and wife, resided in New York City, New York, at the time of filing their petition. Petitioners timely filed their joint Federal income tax returns for calendar years 1971 through 1975, inclusive, with the Internal Revenue Service Center, Holtsville, New York. Mr. Cohn, during his childhood and youth, lived in New Jersey adjacent to a farm where his family kept horses and where he learned to horseback ride at the age of 8. As a teenager and young adult, Mr. Cohn worked around horses. Prior to the time he entered college he earned money by giving riding lessons during a 2-1/2-year period at Stockton Riding Stable. Later he showed horses in New Jersey, and during World War II, under assignment from the United States Army, he cared for horses in Japan. While he was attending law school and after he became a lawyer, Mr. Cohn remained actively interested in horses. He attended horse shows, frequented riding academies, and maintained contact with various other riders. Upon graduation from law school in 1948, Mr. Cohn worked as a law clerk to a judge; he subsequently worked with a private law firm *489 and a corporation. Thereafter Mr. Cohn joined the legal staff of Texaco, Inc. and Texaco Development Corporation in New York City, where he has been employed full-time as an attorney since 1968. During the years in issue Mr. Cohn also engaged in the private practice of patent law. He worked in connection with his private practice several evenings each week, averaging approximately 9 hours a week. Mrs. Cohn began horseback riding at the age of 7 in Pennsylvania. As an undergraduate student at the University of Pennsylvania she elected riding as a sport. After graduation Mrs. Cohn taught riding and at various times took riding lessons. Additionally, she was a volunteer worker at horse shows and clubs. During the years in issue Mrs. Cohn was employed as a librarian by various private law firms located in New York City; she devoted approximately 35 hours weekly to her job. Mr. and Mrs. Cohn both enjoy horses and have maintained their amateur status as riders and for showing horses through the years. Mr. and Mrs. Cohn's interest in horses caused them to seek a weekend and vacation spot where they could horseback ride. In 1952, petitioners first visited West River Lodge and *490 Stable (West River) in Brookline, Vermont. They continued to spend weekends and vacations there as paying guests yearly, excluding 1953, until 1958. Commencing again in 1960, petitioners spent weekends and vacations as paying guests at West River until 1965. Petitioners ordinarily traveled to West River for weekends from early spring through July and for vacations during September and October. Some time prior to 1958 petitioners purchased two geldings and boarded them at West River. During their visits to West River petitioners trained with their horses for competitions. Mr. and Mrs. George C. Ware established West River in 1930 as a lodge for paying guests; they averaged 24 to 30 guests on a weekend basis. Mr. and Mrs. Ware sold West River in 1958 to two men from Connecticut, who resold it to Joe and Julie Nichols in 1960. Mr. and Mrs. Nichols operated West River as a lodge until 1965 when they deeded it to Mrs. Nichols' mother and father, George B. and Elizabeth Englehardt, who held a mortgage on the property. West River consists of 38 acres of land on hich is situated a 100-year-old farmhouse; a three-level barn in which there are fifteen stalls and a tack room; a shop *491 for carpentry, forging and welding; a corncrib; a riding ring; and a parking lot.The farmhouse consists of eight bedrooms--four double rooms in front for eight guests and four bedrooms in the back utilized by the owners and the staff. On July 6, 1965, petitioners leased West River from Mr. and Mrs. Englehardt. The leased premises included the 38 acres on which the main house, stalls and related buildings were located and land on an adjacent hill on which nine cabins, having a capacity of twenty-four guests, were located. The cabins were not winterized and consequently were habitable only 4 months each year.Petitioners' lease term was one year with an option to renew for two additional years. Petitioners exercised this option and thereafter, by written agreement with Mr. and Mrs. Englehardt, petitioners extended their lease to September 30, 1968. On November 8, 1968, petitioners purchased the approximately 38 acres of the West River property from Mr. and Mrs. Englehardt for $38,500. Petitioners did not purchase the cabins on the hill adjoining West River and the land on which they were located; however, Mr. and Mrs. Englehardt permitted petitioners to lease two cabins from *492 1968 until 1972.
Similar to the previous owners of West River, petitioners operated West River as a lodge. West River attracted people generally interested in horseback riding, including local residents, out-of-town guests and residents from other lodges. Generally, these people came to West River to pleasure ride and to take basic and advanced horseback riding training. Over the years, as a result of petitioners' interest in breeding of and hard work with Morgan horses, West River became known for the Cohns' expertise regarding Morgans. [1]
The West River barn capacity is fifteen horses; the shop holds two to four horses. Petitioners normally maintained under fifteen horses. They owned six to eight horses during the years here in issue which could be utilized for riding instruction and rental to guests. Four of the horses had been purchased by petitioners prior to the years here in issue at an average cost of $150 each, and two were homebred. Additionally, petitioners boarded approximately four horses and had two other horses which were generally *493 ridden by petitioners and used by them in escorting trail rides. Occasionally these horses would be rented to highly qualified riders. Petitioners typically employed five people at West River in the summer: Two riding instructors, a cook, a waitress, and a hired man. The summer riding instructors were usually college girls, and the senior instructor had a riding certificate from a riding academy. The riding instructors specialized in English-style riding and taught basic and advanced methods to petitioners' paying guests; they also managed the stable and cared for the horses. The senior instructor taught dressage and driving to some horses and certain advanced riders. Petitioners paid each riding instructor approximately $70 to $80 weekly and provided her with room and board. With the exception of 1975, when the year-round hired man and cook were not fed, petitioners provided meals to all employees during the years at issue. During the winter months when the primary guests at West River were hunters, petitioners employed only a hired man and a cook. During the years in issue, petitioners generally spent approximately 40 weekends a year and vacations at West River. During the *494 time they spent at West River, each petitioner performed work in connection with the operation of West River. Mr. Cohn's major functions at West River included supervising the horse stable operations, leading trail rides, teaching riding in the wintertime, breaking in new horses, and performing such chores and repairs as replacing barn flooring, partitions, and pilings; mending tack sheets and coolers that cover the horses; meeting with veterinarians and aiding in the care of the horses; performing minor surgery on the horses; welding; and doing carpentry work. Mrs. Cohn's activities at West River included consulting with Mrs. Ware and Mrs. Nichols on lodge operations, synchronizing all housekeeping personnel, consulting with the cook as to menus, answering the telephone to take reservations and to respond to questions, replying to letters, tending to guests and horseback riders, escorting trail rides, making arrangements to acquire a liquor license, arranging for purchases from merchants, and maintaining West River's books, records and payroll. Additionally, Mrs. Cohn wrote advertisements to promote West River to be placed in various publications, including "Yankee Magazine," "Horsemen's *495 Yankee Peddler," "Vermont Travel Information Guide," "The West River Valley Association Annual Folder," "The Vermont Area Development Commission Meals and Lodging Booklet," "Vermont Visitors Handbook," "Vermont's Gazetteer," and "New York Magazine." Aside from advertising West River in various publications, petitioners promoted West River by sponsoring a Vermont horse show, showing their Morgan horses, exhibiting horses at Canada's EXPO Show, and sponsoring drills in which local girls participated. Although petitioners donated to a local school any profits made by sponsoring the Vermont horse shows, the shows benefitted petitioners by introducing people to petitioners' Morgan horses and to West River. When petitioners' lease commenced in 1965 they were under the impression that Mr. and Mrs. Nichols had lost money on the operations of West River and were not making a living from the lodge operations. However, petitioners believed that Mr. and Mrs. Ware had earned a living and a profit from West River when they previously owned and operated the lodge. Mr. Ware advised petitioners that they could operate West River profitably, particularly with promised help from himself, his wife *496 and Mr. Englehardt. Mr. and Mrs. Ware assisted petitioners until Mr. Ware's death in 1977. Mrs. Ware advised Mrs. Cohn on many housekeeping aspects of West River, and Mr. Ware assisted Mr. Cohn in maintaining the West River house, barn, and other buildings, doing chores, caring for the horses, acting as chef on trial rides, and assisting in the purchase of horses as needed. Mr. Ware additionally assisted petitioners by writing letters to old customers to suggest that they should consider returning to West River for weekends and vacations. Petitioners did not pay the Wares for their assistance. In 1972, when petitioners ceased to rent the two cabins, Mr. Ware advised petitioners that they needed to expand the capacity of West River for accommodation of guests in order to run a profitable operation. Petitioners decided not to expand the guest capacity. Petitioners realized gross receipts from West River's operations from four sources: Rental of horses for riding and driving, boarding and training of horses, equestrian instruction, and lodging and food. With the exception of food, most of the West River expenses were fixed; however, for the years 1971 through 1973, petitioners *497 managed to reduce certain West River expenses although overall expenses increased. Each year from 1965 to 1979, petitioners operated West River at a loss.For the years 1967 through 1979, petitioners maintained complete and accurate books and records regarding the West River receipts, expenses and net losses, which showed the following: Receipts
Year
Income
Expenses
Loss
1967
$12,341
$20,725
$8,384
1968
12,446
21,990
9,544
1969
12,802
25,839
13,037
1970
14,349
29,573
15,224
1971
14,001
33,062
19,061
(Stable - $6,300
Lodge - 7,701)
1972
14,201
29,993
15,792
(Stable - $6,248
Lodge - 7,953)
1973
16,150
32,557
16,407
(Stable - $8,882
Lodge - 7,268)
1974
14,231
34,385
20,154
(Stable - $7,685
Lodge - 6,546)
1975
14,577
33,785
19,208
(Stable - $8,017
Lodge - 6,560)
1976
15,775
37,480
21,705
1977
17,798
37,793
19,995
1978
17,802
44,083
26,281
1979
17,366
40,802
23,436
Petitioners realized income from the stable by charging for riding and driving instructions, rental of horses and boarding of horses. In 1971 and 1975 petitioners' charges were as follows: Service
1971
1975
Riding--unescorted
$3.00 per hour
$5.50 per hour
Riding--escorted
4.00 per hour
6.50 per hour
Riding--all day
12.00 per day
22.00 per day
Instruction
5.00 per hour or
7.50 per hour or
45.00 for 10 hours
65.00 for 10 hours
Driving, sleighing
skijoring
10.00 per hour
10.00 per hour
Board per horse
50.00 per month or
70.00 per month or
5.00 per day
5.00 per day
*498 Petitioners annually analyzed the revenue and expenses of West River and attempted to improve the financial picture by increasing lodge rates and by attracting new customers and overnight guests. Petitioners made West River available to guests on the American plan at rates for each guest of $16.50 and $18.50 daily; petitioners increased the rates in 1975 to a range of $22 to $30 daily for each guest. Because of the seasonal nature of guest traffic for horseback riding, petitioners housed and boarded hunters at West River in November. Yet, regardless of the time of year, petitioners found that some days and weekends no guests stayed at West River. Mr. and Mrs. Cohn ordinarily flew in their single engine private plane between New York City and West River for weekends and vacations. Occasionally Mr. Cohn, who piloted the plane, also flew lodge guests and the riding instructors to West River on a gratuitous basis. Mr. Cohn generally used the plane in his private law practice but flew it to West River because the travel time was shorter than using bus service or driving a private car from New York. In 1968, petitioners paid $38,500 for the West River property; by 1975 its value *499 had increased to between $65,000 and $71,500. The major asset petitioners had was Mr. Cohn's pension and retirement expectations from Texaco. In 1981, Mr. Cohn's projected pension from Texaco was $1,432.17 per month before taxes or $17,186.04 annually before taxes, assuming a retirement date of January 1, 1985. Mr. Cohn also had accumulated an employee savings plan of $94,281.97, held Texaco stock, and had a $2,263.50 interest in an employee stock ownership plan. Petitioners prepared their own Federal income tax returns from their books and records. Petitioners' income tax returns during the years in issue reflect that petitioners depreciated West River structures based on $38,500, the entire original cost of the property; petitioners failed to allocate a portion of this amount to the land. On their tax returns for 1971, 1972, 1973, 1974 and 1975, petitioners reported gross wages as follows: Year
J. B. Cohn
E. Cohn
Total
1971
$36,500.16
$9,025.16
$45,525.32
1972
38,416.54
8,885.70
47,302.24
1973
40,827.19
8,964.59
49,791.78
1974
42,162.40
5,858.57
49,838.87
1975
51,163.28
4,500.00
55,663.28
Petitioners' Schedules C showed gross *500 receipts and net profits from Mr. Cohn's private law practice in the following amounts: Year
Gross Receipts
Net Profit
1971
$27,164.65
$13,718.71
1972
35,821.45
9,453.78
1973
49,846.31
16,703.50
1974
44,558.33
11,805.94
1975
40,452.06
12,922.13
During the years in issue petitioners claimed loss deductions in connection with West River, including amounts for depreciation, taxes, rent, repairs, salaries, insurance, interest, utilities, air and other transportation, and miscellaneous expenses as follows: [2]
Taxable
Claimed
Year
Loss Deduction
1971
$19,060.75
1972
15,792.47
1973
16,406.67
1974
20,153.90
1975
19,207.98
*501 Respondent disallowed the claimed losses with the explanation that the expenses "were not incurred in an activity engaged in for profit * * * [and accordingly] are not allowable under section 183 [3] of the Internal Revenue Code." [4]
OPINION Section 183(a) prescribes the general rule regarding the limitation on deductibility of expenses where an individual engages in an activity which is not engaged in for profit. Pursuant to section 183(a), no deduction attributable to the activity is allowed except as provided within section 183(b). Section 183(b)(1) provides that deductions otherwise allowable without regard to whether such activity is engaged in for profit--for example, taxes and interest--are allowable. Section *502 183(b)(2) provides that deductions which would be allowable only if the activity is engaged in for profit shall be allowed "only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1)." Section 183(c) defines an activity not engaged in for profit to include "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." Petitioners contend that West River was an activity in which they engaged with the intent and the expectation of making a profit during the years here in issue. Respondent, on the other hand, contends that petitioners' operation of West River was an activity "not engaged in for profit" within the meaning of section 183(a). The test for determining whether an individual is engaged in an activity for profit is whether he engaged in the activity "with the actual and honest objective of making a profit." Dreicer v. Commissioner,78 T.C. 642, 645 (1982), on appeal (D.C. Cir., June 1, 1982).The individual's predominant purpose and intention must be to make a profit. *503 Allen v. Commissioner,72 T.C. 28, 33 (1979); Dunn v. Commissioner,70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980). However, a taxpayer's expectation of profit need not be a reasonable one, but he must enter into the activity, or continue it, with the objective of making a profit. Section 1.183-2(a), Income Tax Regs.; [5]Allen v. Commissioner,supra at 33; Golanty v. Commissioner,72 T.C. 411, 425-426 (1979), affd. in an unpublished opinion, 647 F.2d 170 (9th Cir. 1981). *504 Whether the requisite profit objective exists is determined on the basis of all the facts and circumstances of record. Dunn v. Commissioner,supra at 715-720; Golanty v. Commissioner,supra;Allen v. Commissioner,supra;section 1.183-2(b), Income Tax Regs. The burden of proof is on petitioners to show the existence of a profit motive. Golanty v. Commissioner,supra.
Section 1.183-2(b), Income Tax Regs., sets forth some of the relevant factors, derived principally from prior case law, to be considered in determining whether an activity is engaged in for profit. See Golanty v. Commissioner,supra at 426; Boyer v. Commissioner,69 T.C. 521, 537 (1977); Benz v. Commissioner,63 T.C. 375, 382-383 (1974).The listed factors include: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other *505 similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profit, if any, which is earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. No one factor is conclusive. The ultimate fact to be determined is the taxpayer's intent, and the evidence as to any one factor must be considered for its bearing on the determination of this ultimate fact. After consideration of all the facts and circumstances, we conclude that petitioners' operation of West River was an activity not engaged in for profit during the years here in issue.In this case some of the more significant factors which we have weighed are petitioners' overall conduct of the West River operations, their financial status, the loss history of the West River operation and their interest in horses and horse showing as a recreational activity. Petitioners did not have a concrete plan for improving the profitability potential of West River. The record of losses attributable to the West River operations, coupled with petitioners' failure to substantially change their method of *506 operating West River, support this conclusion. From 1965, when they began operating West River as a leased facility, through 1979, petitioners consistently sustained losses; no profits were realized. The amount of losses increased over the years: In 1967 the loss was $8,384; by 1972 the losses had increased to $15,792. In 1975 losses were $19,208 and by 1979 losses were $23,436. For the 13 years, 1967 through 1979, on which the parties submitted information, the losses totaled $228,228.Even with this continuous loss history, the evidence does not indicate that petitioners undertook substantial remedial measures to improve the West River financial picture. Petitioners testified that a large portion of their expenses were fixed and could not be reduced readily. This contention is not persuasive in the face of a record that shows that petitioners' mode of transportation to and from West River was by private plane. Certainly, transportation is an expense that might have been reduced in order to lower losses. Furthermore, the record shows little, if any, effort on the part of petitioners to increase the revenues from any of their operations. Petitioners could have taken additional *507 steps to increase the West River revenues. For example, it is clear that petitioners did not operate the lodge at full capacity and did not operate the horse training and boarding capability at full capacity. Revenues could have been increased by operating at full capacity or by further increasing charges.Moreover, petitioners utilized the same promotion media for many years. To expand their potential market and to attract new individuals and families to West River, petitioners could have advertised in publications that would have reached previously untapped audiences. As we stated in Bessenyey v. Commissioner,45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967) -- The presence of losses in the formative years of a business * * * is not inconsistent with an intention to achieve a later profitable level of operation, bearing in mind, however, that the goal must be to realize a profit on the entire operation, which presupposes not only future net earnings but also sufficient net earnings to recoup the losses which have meanwhile been sustained in the intervening years. Petitioners suggest that their devotion to West River and the Property *508 appreciation in the end will enable them to realize a profit. They contend that the losses were only symptoms of the early years of operation of West River and that in time the West River operations will become profitable. Petitioners' arguments in this regard are inconsistent. They argue on the one hand that they expect to retire at West River and will need to make a profit to supplement Mr. Cohen's retirement income. On the other hand, Mr. Cohen testified that by 1975 he realized that he and Mrs. Cohen could not make a profit from operating West River and would have sold it except that the market was not right for a sale, so the property was held for its appreciation in value. However, the record shows that the rate of losses at West River were such that they could not be recouped even by Mr. Cohen's unsupported speculation of the anticipated appreciation in value of the property. Furthermore, the objective evidence shows that petitioners were aware long before 1975 that West River could not be operated at a profit without substantial changes in the method and type of operation; however, they took no steps to make any of the necessary changes. For example, Mr. Ware, on whose *509 advice petitioners claim to have relied, told them in 1972 that it would be necessary to increase the capacity of West River for paying guests to have a profitable operation, but the record does not show that petitioners made efforts to enlarge the guest capacity. The strong indication from this record is that petitioners knew after renting West River for 3 years, and certainly before 1971, that the operation would not be profitable absent substantial changes, which they were unwilling to make. Thus, the evidence in the instant case does not support a conclusion that petitioners sustained losses merely in the formative years and that petitioners had in sight future earnings and appreciation of sufficient amounts to recoup their substantial losses. In fact, with a record of a substantial loss over so many years, the evidence is persuasive that petitioners did not have a bona fide objective of making a profit during the years in issue. Section 1.183-2(b)(6), Income Tax Regs.; Wiles v. United States,312 F.2d 574, 576 (10th Cir. 1962); Golanty v. Commissioner,supra at 426-427.
We are convinced that petitioners' primary motivation in operating *510 West River was other than to earn a profit. Respondent suggests that petitioners looked to West River to fulfill a tax shelter function. It is possible that petitioners considered this. Petitioners earned good salaries and Mr. Cohn's part-time law practice was profitable. The record shows that petitioners had no other investments which might produce losses to offset their earnings. Therefore, the losses that petitioners sustained in the operation of West River resulted in appreciable tax savings for them. Taking into account the claimed tax savings, the overall result is that the operation of West River provided a very economical method for petitioners to pursue their lifelong hobby of riding, training and showing horses. Respondent further contends that petitioners may have viewed West River as a recreational activity. Both petitioners enjoyed horseback riding, and for a number of years prior to their lease and subsequent purchase of West River they had traveled there for weekends and vacations to horseback ride and to train their boarded horses. Although petitioners' purchase of West River extended this interest into a more formal and time demanding pursuit, it does not follow *511 that the purchase of West River changed petitioners' basic reason for traveling there. In fact, the record strongly suggests that petitioners purchased West River so that upon Mr. Cohn's retirement in 1985, they could pursue, on a full-time basis, their interest in and the pleasures of training and riding horses. Although the testimony shows that petitioners worked on chores and catered to guests during their weekends and vacations at West River, it does not support a conclusion that their labors were primarily motivated by an intention to make West River a profitable venture. The record shows that the lifelong hobby of each petitioner was riding, training and showing of horses and that they had a substantial amount of leisure time. We conclude from the evidence as a whole that petitioners' interest in operating West River was largely for social, personal and recreational purposes. In reaching our conclusion that the operation of West River was not an activity engaged in by petitioners for profit, we have not overlooked the facts that before purchasing West River and for several years thereafter, petitioners consistently sought the advice of Mr. and Mrs. Ware, prior owners of *512 West River who had succeeded in making West River a profitable operation, or petitioners' attempt to promote West River as a place for horseback riding and training, and for their expertise with Morgan horses. We have also considered the fact that petitioners maintained detailed books and records and annually reviewed their revenues and expenses. However, in weighing these facts along with all the other facts of record, we have concluded that petitioners did not have the requisite bona fide motive to derive a profit from the operation of West River during the years here in issue.
Accordingly, we hold that the losses attributable to the operation of West River during 1971, 1972, 1973, 1974 and 1975 are subject to the limitations on expense deductibility as provided under section 183. Decision will be entered for the respondent.
Footnotes
1. The Morgan horse is an old American breed which started in Vermont. It is bred for its ability to quickly run the quarter mile.↩
2. The claimed loss deductions attributable to West River operations resulted from the following itemized expenses: ↩
1971
1972
1973
1974
1975
Depreciation
$1,946
$1,950
$2,074
$1,985
$1,575
Taxes
1,031
809
906
1,089
Rent
320
270
Repairs
1,430
83
1,767
Plumb. & Equip.
1,188
274
373
76
Elect. Repair
78
72
33
67
House Repair
680
160
Truck & Auto
281
344
554
287
Tractor
183
29
Gas
66
Misc.
293
Salaries
7,371
6,440
6,870
8,604
9,976
Insurance
1,004
1,579
1,492
1,344
1,634
Legal Fees
153
Interest
2,166
2,166
Supplies
1,614
1,627
787
1,637
1,690
Services
1,703
1,803
1,300
1,202
1,082
Commissary
3,730
4,293
6,704
6,457
6,079
Feed & Seed
1,334
854
1,894
1,995
1,780
Gas & Elec.
1,576
1,756
1,930
2,335
2,265
Vet, farmer
1,115
886
794
650
1,045
Adv. & Misc.
340
101
140
459
571
Transp. (Air)
4,280
3,880
4,050
4,800
4,800
Transp. (Land)
913
864
381
657
537
Taxi
22
Deductions
$33,061
$29,994
$32,558
$34,385
$33,786
3. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years here in issue, unless otherwise indicated. ↩
4. For taxable year 1975, respondent additionally disallowed $1,196.16 which petitioners claimed on Schedule A as a deduction for real estate taxes paid with respect to West River.Petitioners have conceded that respondent's statutory notice computation otherwise accounted for the deductibility of this tax.↩
5. Sec. 1.183-2(a), Income Tax Regs., provides in relevant part: the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212. * * * Except as provided in section 183↩ and section 1.183-1, no deductions are allowable for expenses incurred in connection with activities which are not engaged in for profit. Thus, for example, deductions are not allowable under section 162 or 212 for activities which are carried on primarily as a sport, hobby, or for recreation. The determination whether an activity is engaged in for profit is to be made by reference to objective standards, taking into account all of the facts and circumstances of each case. Although a reasonable expectation of profit is not required, the facts and circumstances must indicate that the taxpayer entered into the activity, or continued the activity, with the objective of making a profit. In determining whether such an objective exists, it may be sufficient that there is a small chance of making a large profit. * * *