JEROME B. FELDMAN AND WENDY FELDMAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Feldman v. Commissioner
Docket No. 9349-81.
United States Tax Court
T.C. Memo 1986-287; 1986 Tax Ct. Memo LEXIS 321; 51 T.C.M. (CCH) 1412; T.C.M. (RIA) 86287; July 14, 1986. Jerome B. Feldman, pro se. Patrick E. McGinnis, for the respondent. GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: Respondent determined deficiencies in and additions to the Federal income taxes of petitioners as follows: Additions to
Year
Deficiency
Tax - Sec. 6651(a) [1]
1972
$6,882.79
1973
17,105.50
1974
19,803.99
1975
47,364.42
$9,506.42
1976
19,836.60
$3,892.00
1977
13,142.82
After concessions, [2] the sole issue for consideration is whether petitioners' quarter horse operation *323 was an "activity not engaged in for profit" within the meaning of section 183. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. At the time of the filing of the petition, Jerome B. Feldman (petitioner) was a resident of Delray Beach, Florida, and Wendy Feldman (Wendy) was a resident of Boca Raton, Florida. Petitioners were husband and wife at all times relevant to the proceedings. They filed joint returns for the years 1972 through 1977. Petitioners' income tax return for the year 1975 was filed on April 6, 1978, and *324 their income tax return for the year 1976 was filed on April 5, 1978. Petitioners met in 1969. Drawn together in part by a common interest in horses, they married. The couple's interest in horses was shared by their four children, all of whom are products of a prior marriage. Around 1970 petitioners vacationed at a riding camp in New York. Petitioners enjoyed the camp to such an extent that they decided to send their children to it. Before the end of the children's camp season petitioners purchased two horses, which were boarded at the camp. Petitioners sent their children to the camp for the 1971 season. Petitioners visited the camp often and rode their horses. By the end of the 1971 season petitioners purchased two additional horses, one of which was a registered quarter horse. After the close of the 1971 camp season, petitioners' four horses were moved to a stable not far from their three-bedroom apartment in Fort Lee, New Jersey. The move was made so that the family could become more involved with the horses and avoid the lengthy drive to the camp. The horses, however, perished in a stable fire shortly after they were brought to New Jersey. Petitioners had a developing *325 interest in quarter horses and, after the fire, purchased two registered quarter horses, Killian's Rebel and Toad's May Lady. Petitioners exhibited their horses at shows and regarded these events as a good outlet for themselves and the children, who could compete and learn how to care for the horses. Petitioners continued to attend shows through 1972. Two of petitioners' children, Michele and Steve, showed the horses and in September 1972 a third quarter horse was purchased (Do It, Joe) for one of the children to show. At horse shows and at the ranches where petitioners' horses were stabled and trained, petitioners met people familiar with the operation of horse farms. From these experiences petitioners learned the rudiments of horse care and training and basic farm operations. Petitioners, at a time when they had only a basic knowledge of how to operate a horse farm, decided to look at farm facilities that were for sale. Petitioners located farm property in Annandale, New Jersey, about 60 miles from New York City, and after showing the property to several friends involved with horses, petitioners purchased the land during September 1972. The property was a 135.5-acre operating *326 horse farm with stalls, pastures, paddocks and basic farm equipment. Situated upon the property were a two-story, four-bedroom colonial frame house; a second, smaller dwelling unit; a carriage house; several barns; tack rooms and garages. The property also included a fully landscaped, 25-foot by 50-foot concrete swimming pool. The purchase price for the entire property was $500,000. Petitioners purchased the Annandale property as a residence and as a place to breed, raise, show and sell quarter horses. Petitioners called their horse farm Wenfel Farms. At the time petitioners acquired the Annandale property, petitioner was president of and a 50-percent shareholder in Felbar Fabrics Corporation of New York City. In later years petitioner became an officer and part owner of two other New York City textile firms. About the time petitioners acquired Wenfel Farms, petitioners purchased Madonna's Doll and King's Miss Lou as show or brood mares. Petitioners and their children moved to the farm during the fall of 1972. They brought their horses, then five in number, with them. In October 1972 petitioners purchased two additional show mares, Chick's April Fool and Sue's Missy Red. *327 Prior to her acquisition, Sue's Missy Red had been shown and had accumulated show points so as to entitle her to "champion" status. [3]
On their tax return for 1972, petitioners, on a Schedule C (Profit (or Loss) From Business or Profession), reported no income from Wenfel Farms, and claimed deductions of $13,831.49 for a loss on its operation. Petitioners received and reported $97,550 in income from wages paid by Felbar Fabrics Corporation. In 1973 and continuing through 1976, petitioners followed an established routine on the farm. Usually four days a week, petitioner would leave the farm early in the morning and commute to his job in New York City; generally he would return late in the evening. The children would feed the horses in the morning before school. Wendy would then muck the stalls and exercise *328 the horses. She would make certain that the farm had adequate feed and bedding and that the horses were clean and groomed. On some weekends petitioners would drive their horses to shows. At appropriate times during the year, petitioners would prepare and position their brood mares for breeding with their stallion. Petitioners owned seven horses at the start of 1973 and they encountered problems with many of them. Do It, Joe had proven to be a poor show horse, and Toad's May Lady had not performed too well either. Mandonna's Doll and King's Miss Lou also seemed deficient as show horses and were used as brood mares. During 1973 petitioners sold Do It, Joe and bought no horses. Petitioners knew that they needed help with their horses, and hired a local trainer to assist them. On their tax return for 1973 petitioners, on a Schedule C, reported receipts of $1,926 from board paid by horse owners who kept their animals at Wenfel Farms and shavings sold as bedding material for horses. Petitioners claimed total deductions of $33,899.39, for a net claimed loss of $31,973.39 on the operation of Wenfel Farms. On a Schedule D (Capital Gains and Losses) petitioners claimed an $850 loss on *329 the sale of Do It, Joe. In addition to their claimed losses from Wenfel Farms, there was reported $84,650 in income to petitioner from his business activity in the textile business. Petitioners, during 1974, purchased three additional show mares: Suggar Sandy Bar, Fancy Feather and Dawn Eternal. Suggar Sandy Bar and Fancy Feather had accumulated show points to entitle them to "champion" status. Two fillies were born during 1974: Killian's Doll and King's Miss Rebel. During 1974, petitioners bred one of their mares with a stallion that had "champion" status and acquired a few cows to maintain their pastures and provide a source of revenue from the sales of calves. Petitioners also hired new trainers, a husband and wife team whom petitioners believed possessed great expertise. During 1974 petitioners' daughter, Michele, attended and competed successfully in many horse shows. Petitioners advertised horses and their farm in equine publications. Despite these developments, petitioners continued to have difficulty in selling horses. They did not sell a single horse in 1974. At the end of 1974 petitioners again changed trainers in the hope of increasing sales. On their tax return *330 for 1974, petitioners reported total farm receipts of $2,809 from Wenfel Farms.Most of the receipts were attributable to the boarding of horses for others; $350 came from the sale of a calf, and $125 from a prize in a horse show. Petitioners claimed total deductions of $49,021, for a net loss of $46,212. In addition to their claimed losses from Wenfel Farms, petitioner's income from business activity in the textile business was reported in the amount of $89,000. During 1975 petitioners continued to attend horse shows. Three foals, all colts, were born to petitioners' mares during the year: Rebels Tusox, Payday Overdue, and Killian's Boy. Two mares, Madonna's Doll and Chick's April Fool, were sold. [4] Madonna's Doll had proven unsatisfactory as a brood mare, and Chick's April Fool did not have great success as a show horse. Petitioners experienced a number of other difficulties during 1975. Petitioner's textile business had problems, and he was forced to devote more time to it. Michele no longer wanted to show horses. The continuing high expenditures connected with the farm strained petitioners' marriage. For a short period of time Wendy left the farm, taking most of the horses *331 with her. For their 1975 taxable year petitioners, on a Schedule C, reported total receipts of $2,457 from selling calves and boarding horses. Petitioners claimed total deductions of $58,967, for a net loss of $56,510. On a Form 4797 (Supplemental Schedule of Gains and Losses) petitioners claimed, after depreciation and selling expenses, a $293 loss on the sale of Madonna's Doll, and a $725 loss on the sale of Chick's April Fool. In addition to their losses from Wenfel Farms, there was reported income from petitioner's textile business activity in the amount of $96,050. In 1976 petitioners continued to exhibit horses at competitive shows. In some ways, however, the operation of Wenfel Farms changed during the 1976 year. Petitioner's textile business went bankrupt and he spent all of his time at the farm, working at such tasks as training horses. Because he no longer had income from the textile business, petitioner put part of the farm property up for sale. Wendy began study for a real estate license in order to help market the farm property and supplement petitioners' income. Petitioners continued to *332 have marital problems. Four more foals were born: Silvers Prince (a colt, later gelded), Pesky (another colt later gelded), Sue's Love Story (a mare), and an unnamed mare. Fancy Feather was sold at a loss during the year. On their 1976 Schedule C petitioners reported $4,200 in receipts from Wenfel Farms: $3,000 from the sale of two foals, Killian's Boy and the unnamed mare born in 1976. Petitioners claimed total deductions of $49,778, for a net loss of $45,578. In addition, on a Form 4797 petitioners, after taking into account depreciation and selling expenses, claimed a $600 loss on the sale of Fancy Feather. The reported sales price of Fancy Feather was $8,500, $2,500 less than its purchase price. There was also reported income from petitioner's textile business activity in the amount of $46,220, and salesman's commissions of $11,000. Petitioners' difficulties persisted into 1977. Petitioners separated during the year and Wendy rented a nearby house and worked full-time as a real estate agent. Although Wendy continued to assist in the operation of the farm, petitioner was in charge. To generate cash, petitioners sold in excess of 31 acres of the farm. Petitioners had not *333 intended when they purchased the property to split off part for later resale. Petitioners' horses were exhibited at a number of shows and five horses were sold: Killian's Rebel, Toad's May Lady, King's Miss Rebel, Killian's Tusox and Pesky.Killian's Rebel and Toad's May Lady had proven unsatisfactory for both show purposes and breeding. Three colts, which were later gelded, were born in 1977: Sweet Bar Sandy, Story Fells and an unnamed horse. [5] By the end of 1977, petitioners' owned 10 horses. On their Schedule C for 1977, petitioners reported receipts of $3,900 from Wenfel Farms and they claimed total deductions of $42,227, for a net loss of $38,327. On their Form 4797 petitioners reported the following receipts from the sale of horses: Killian's Rebel, purchased for $2,500 and fully depreciated, sold for $350; Toad's May Lady, purchased for $1,500 and fully depreciated, sold for $1,000; King's Miss Rebel, one of petitioner's foals, sold for $5,000, leaving petitioners a $4,500 gain after payment of a commission; Killian's Tusox, another foal, sold for $2,500; and Pesky, yet another foal, sold for $650, giving *334 petitioners a gain in that amount. On a Schedule D petitioners reported an aggregate gain of $69,702 on the sale of three parcels of the farmland. Petitioners on their Form 1040 did not report any income from the textile business. From October 1972 to the end of 1977, petitioners never consulted with or procured written advice from a professional with business expertise to seek either an increase in income or a decrease in expenses of Wenfel Farms. Petitioners kept pedigree, show breeding and veterinary records, but did not prepare basic financial records such as profit and loss statements or balance sheets. In a notice of deficiency to petitioners, respondent disallowed losses claimed by petitioners from their quarter horse operation. Respondent stated that these losses were not from an activity entered into for profit. OPINION The only issue presented is whether the operation of Wenfel Farms was an activity not engaged in for profit. Section 183 disallows certain deductions attributable to an activity not engaged in for profit. [6] An "activity not engaged in for profit" is defined *335 by section 183(c) as any activity other than one for which deductions are allowable under section 162 (relating to trade or business expenses) or section 212(1) or 212(2) (relating to expenses for the production or collection of income, or for the management, conservation or maintenance of property held for the production of income). *336 Breeding and raising horses for sale may constitute a trade or business for purposes of section 162. Engdahl v. Commissioner,72 T.C. 659, 665 (1979). Whether it does or not depends on whether making a profit was the primary purpose of the venture. Engdahl v. Commissioner,supra at 666; Dunn v. Commissioner,70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980). A taxpayer need not prove that he had a reasonable expectation of profit in order to establish that he engaged in the activity for profit; he must show, however, that he entered into or continued the activity with the actual and honest objective of making a profit. See. 1.183-2(a), Income Tax Regs.; Dreicer v. Commissioner,78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Golanty v. Commissioner,72 T.C. 411 (1979), affd. without opinion 647 F.2d 170 (9th Cir. 1981). In determining the taxpayer's purpose, greater weight is given to objective facts than to the *337 taxpayer's mere statement of intent. Sec. 1.183-2(a), Income Tax Regs.
All facts and circumstances that bear on the activity are to be taken into account in determining whether it was engaged in for profit. Sec. 1.183-2(b), Income Tax Regs. Included in the regulation are nine factors as among those that should normally be considered: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) the presence of elements of personal pleasure or recreation. No single factor is controlling. Golanty v. Commissioner,supra at 426; Dunn v. Commissioner,supra at 720. *338 Petitioners argue that they were engaged in the business of breeding, raising and showing horses. Respondent contends that petitioners' quarter horse operation was not a business. We agree with respondent. In support of their argument that the quarter horse operation was a business, petitioners point to the manner in which the operation was conducted. Petitioners assert that they (1) purchased a suitable facility for the conduct of a business, (2) maintained a full set of books, (3) publicized their operation extensively, and (4) made changes in operating procedures in an effort to increase profitability. These assertions are not fully supported in the record. To the extent they are supported, we have not been persuaded that petitioners intended to make a profit from the operation of Wenfel Farms. First, while Wenfel Farms may have been generally suitable for use as an operating horse farm, it may not have met the needs of a horse breeder beginning a business venture. [7] Additionally, petitioners purchased more than a basic facility on which horses could be bred, trained and sold. They acquired a large tract of land within commuting distance of New York City with a fully *339 landscaped four-bedroom house and swimming pool. Petitioners have not established that the Wenfel Farms property was suitable or designed to be other than a recreational horse-breeding facility. Second, while petitioners maintained certain financial and equine records, there is no indication that they used them to consider and implement cost savings and/or produce profits. Petitioners did not have profit and loss statements or balance sheets prepared for their quarter horse operation. [8]Keeping pedigree, show, breeding and veterinary records, as petitioners did, is as consistent with pursuing a hobby as it is with running a business. See Golanty v. Commissioner,supra at 430. *340 Third, recreation and personal recognition rather than profit-seeking appear to have motivated petitioners to participate in horse shows and advertise in equine publications. The financial benefit to petitioners from taking part in numerous horse shows was not commensurate with the effort involved nor, we believe, with the personal satisfaction petitioners took from attending these events and having their horses compete. Petitioners' advertising and occasional sale of a horse only partially offset their expenses. This is not the same as a consistent effort to exhibit and advertise in order to realize a profit on the overall operation of the horse farm. Fourth, any possible benefits from changes petitioners claim to have instituted to produce profits were more than offset by their continuing unsound practices. For example, in 1974 petitioners began to breed their mares with a better quality stallion owned by another horse breeder. During the taxable years at issue, however, poor breeders and show animals were retained for extended periods. [9] Although petitioners replaced trainers, they made no significant changes in their efforts to market horses. *341 Petitioners claim that they consulted with and relied on experts in operating Wenfel Farms, but the evidence fails to support this assertion. At no time during the six highly unprofitable years before us did petitioners turn to an independent outside consultant for advice on the purchase of property, selection of horses, or management of the farm. Instead, petitioners relied on their own admittedly limited experience and on informal discussions with individuals whose objectivity and ability to organize and manage a profit-making horse farm has not been established. While a formal market study is not required under the regulations, a basic investigation of the factors that would affect profit is. See Golanty v. Commissioner,supra at 432; compare Engdahl v. Commissioner,supra at 668. Petitioners spent considerable time attending to the operation of their horse farm. They argue that their hard work bespeaks an intention to realize a profit. Hard work *342 alone, however, is not enough to establish a profit-seeking motive. See Golanty v. Commissioner,supra at 427; Burger v. Commissioner,T.C. Memo. 1985-523, on appeal (7th Cir., Apr. 4, 1986). Like businesses, recreational pursuits are at times tedious and unpleasant. Petitioners and their family enjoyed activities involving horses, and we believe that they were willing to muck stalls and perform other unappealing tasks as the price for their enjoyment. [10]
Despite operating losses extending over six years, petitioners claim to have made a net profit overall after unrealized *343 appreciation in the value of their land and horses is taken into account. Petitioners' claim rests implicitly on the proposition that operating the horse farm and holding the farmland constituted a single activity for petitioners, rather than separate activities, so that appreciation in the value of the horses and of the land are considered together. Petitioners' proposition as presented is highly questionable.See section 1.183-1(d)(1), Income Tax Regs.; Golanty v. Commissioner,72 T.C. 411, 429-430 (1979); Frazier v. Commissioner,T.C. Memo. 1985-61; Boddy v. Commissioner,T.C. Memo. 1984-156, affd. without published opinion 756 F.2d 884 (11th Cir. 1985). We need not decide, however, whether petitioner's claim is correct. Petitioners' claim of a net profit overall is based on unsubstantiated estimates of the appreciation in value over cost, as of December 31, 1977, of their herd and of their unsold farmland. We do not accept these estimates and on this basis reject petitioners' claim. Petitioners argue that their operating losses are typical of the start-up phase of a horse-breeding *344 business and, moreover, were due to circumstances beyond their control. They attribute their difficulties to economic recession, inflation, marital discord, ailments suffered by their horses, problems with their trainers and the failure of petitioner's textile business. Difficulties at the outset, anticipated and unanticipated, indeed may cause losses in a profit-oriented operation; it does not follow, however, that an operation that suffers such difficulties is profit-oriented, rather than recreational in nature. [T]he presence of losses in the formative years of a business, particularly one involving the breeding of horses, is not inconsistent with an intention to achieve a later profitable level of operation, bearing in mind, however, that the goal must be to realize a profit on the entire operation, which presupposes not only future net earnings but also sufficient net earnings to recoup the losses which have meanwhile been sustained in the intervening years. Bessenyey v. Commissioner,45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967), *345 cert. denied 389 U.S. 931 (1967). Petitioner testified that he expected to recover his losses and make a profit five to eight years from the start of his horse breeding operation. He testified in general terms about the prices yearlings and two-year-olds and horses with better breeding commanded, but never stated the mix or number of horses he expected to sell at various points in the operation of Wenfel Farms. It is not for us to surmise how petitioners might have gone about eliminating losses that mounted yearly. Given the vagueness of petitioners' purported plan and their history of losses, we are not persuaded that start-up difficulties or unforeseen circumstances masked a true intention to make a profit. The possibility of receiving a substantial profit from a highly speculative venture may indicate that the activity is engaged in for profit, even if losses are actually generated. See sec. 1.183-2(b)(7), Income Tax Regs. Petitioners claim that a number of their horses "'just missed' becoming great horses" and that "[t]he production of only one or two such great horses could have changed the entire profit picture of the business. *346 " Based on our review of the record, petitioners were never on the threshold of economic success. For instance, while petitioners claim to have been offered $20,000 for Fancy Feather, the mare in fact sold for $8,500, $2,500 less than its purchase price. Obviously, petitioners could not have offset their losses through such sales, nor through a breeding program that never produced a foal selling for more than $5,000. A desire to establish a source of retirement income, according to petitioners, was a major reason for their decision to set up a horse-breeding operation. Petitioners attempt to equate their financial situation with that of the taxpayers in Engdahl v. Commissioner,supra, whom we concluded had founded a horse-breeding business in the hope of producing retirement income. Those taxpayers, however, differed in important respects from petitioners herein. Dr. Engdahl's retirement from his professional practice was imminent at the time he established a horse-breeding operation. Neither he nor his wife rode horses, and the personal pleasure of their children was not a factor in their decision to begin a horse farm. Our consideration of the facts in *347 this case does not lead us to the conclusion that retirement planning played a role in petitioners' acquisition and operation of a horse farm. What we do believe to be of significance was petitioners' financial ability to pursue an expensive form of recreation. For most of the years at issue, petitioner's income from his textile business was more than adequate to provide funds for this type of recration. [11] For each of those years petitioners were able to offset part of this income by losses from Wenfel Farms; in effect, the Government subsidized part of the tab for petitioners' choice of an avocation and lifestyle. Although petitioners maintain that they did not derive personal pleasure or recreation from their horse operation, the evidence is to the contrary. Both petitioners were avid riders. They regarded horse shows as a rewarding family activity, and took pride in the performance of their horses at these events. In summary, we conclude that petitioners' quarter horse operation was not an activity engaged in for profit. Accordingly, *348 the losses claimed by petitioners from Wenfel Farms are allowable only as provided in section 183(b). To reflect concessions, Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended and in effect for the taxable years at issue. ↩
2. Respondent conceded that petitioners did not receive a constructive dividend from Felbar Fabrics Corp. in 1975. Petitioners neither have presented evidence nor argued on brief that they sustained a sec. 1244 loss on Felbar Fabrics Corp. stock in 1977, or that the sec. 6651(a) addition to tax for late filing is inapplicable for 1975 and 1976. We accordingly find that petitioners have conceded these issues.↩
3. Sue's Missy Red and some of petitioners' other horses participated in American Quarter Horse Association shows. Horses in these events were entered in different classes and judged and awarded points on the basis of confirmation, gait and other characteristics. Horses with a certain number of points achieved champion status within the class in which they competed.↩
4. One of the 1974 foals, Killian's Doll, may also have been sold.↩
5. Petitioners' records refer to this horse as a "50% gelding."↩
6. SEC. 183. ACTIVITIES NOT ENGAGED IN FOR PROFIT. (a) General Rule. -- In the case of an activity engaged in by an individual * * *, if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section. (b) Deductions Allowable. -- In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed -- (1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and (2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1).↩
7. Petitioners sold part of the property in 1977. Wendy gave the following testimony regarding the sale: We had realized that we had over -- we had bought more land than we actually needed, and we needed to sell off some of the business property in order to keep our horse operation going. * * *↩
8. In contrast, monthly trial balances and quarterly profit and loss statements were prepared for petitioner's textile business.↩
9. For instance, petitioners kept Toad's May Lady for over five years although she was inadequate both as a brood mare and show horse.↩
10. Sec. 1.183-2(b)(3), Income Tax Regs.↩, in part provides that a taxpayer's withdrawal from another occupation to devote most of his energies to an activity may be evidence that the activity is engaged in for profit. For part of 1976 and all of 1977, petitioner, formerly a highly compensated executive in the textile industry, worked full-time on the farm. He did so, however, only after Felbar Fabrics Corp. had failed. The record does not indicate that petitioner declined opportunities in the textile business in order to work on the farm.
11. Petitioners' income from this source ended in 1977, but other factors bearing on petitioners' intent did not change significantly.↩