T.C. Memo. 2019-154

UNITED STATES TAX COURT

LOWELL G. DEN BESTEN, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 9768-15.                          Filed November 25, 2019.

Lowell G. Den Besten, pro se.

Dennis Richard Onnen, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

PARIS, Judge:  Respondent determined deficiencies in petitioner's Federal

income tax of $51,360, $46,200, $66,692, $41,228, and $25,214 and accuracy-

related penalties under section 6662(a)[1] of $10,272, $9,240, $13,338.40,

_____

[1]Unless otherwise indicated, all section references are to the Internal
                                                          (continued...)

[*2] $8,245.60, and $5,042.80 for 2006, 2007, 2008, 2009, 2010, respectively.

Respondent also determined additions to tax under section 6651(a)(1) of $12,585

and $11,158 for 2006 and 2007, respectively.

After concessions,[2] the issues remaining for decision are whether:

(1) petitioner's cutting horse activity was an activity "not engaged in for profit"

within the meaning of section 183, (2) petitioner substantiated expenses and net

operating losses (NOL), and (3) petitioner is liable for accuracy-related penalties

under section 6662(a) for the years in issue.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The first

stipulation of facts, the first supplemental stipulation of facts, the second

supplemental stipulation of facts, the third supplemental stipulation of facts, and

the exhibits attached thereto, are incorporated herein by this reference. Petitioner

resided in South Dakota when he timely filed his petition.

---

[1](...continued)
Revenue Code (Code) in effect at all relevant times, and all Rule references are to
the Tax Court Rules of Practice and Procedure.

[2]The parties made concessions in the first stipulation of facts, the first
supplemental stipulation of facts, and the third supplemental stipulation of facts.
Respondent made additional concessions in his answering brief. These
concessions are binding in the parties' Rule 155 computations.

[*3] I.     Petitioner's Activities

A.     Dakota's Best Seed

Petitioner started his seed business in 1964.  He originally started his seed business as a corporation with his father, and it now operates in South Dakota organized as Dakota's Best Seed, LLC (seed business).  The seed business cleans and markets seeds for plants such as alfalfa, oats, native grasses, and corn.  The company purchases combined seeds; and after a complicated multistep cleaning process, they are separated, bagged, and shipped across the United States and Canada to approximately 100 dealers.  The seed business annually processes approximately 1.5 million pounds of alfalfa seeds and sells hundreds of semi truck loads of bagged oat seeds.

In 2002 petitioner sold the original seed business to his son for $4,283,000 and reported the sale proceeds using the installment method.[3]  At the time of sale he intended to focus all his effort, time, and money on his cutting horse activity, but his son did not succeed in the seed business and defaulted on the installment payments on the corporate stock sale.  Only three payments--$424,007 in 2002, $42,483 in 2003, and $259,180 in 2004--were made on the installment sale.

_____

[3]On his 2002 Form 1040X, Amended U.S. Individual Income Tax Return, petitioner also reported seed business nonpassive losses and suspended losses totaling over $2.2 million from prior years.

**[\*4]**  In 2005 petitioner returned to the seed business in an attempt to salvage

what was left of it.  Petitioner was once again in the seed business but now

operated it as a new limited liability company.  For each year in issue petitioner

reported the new seed business on a Schedule C, Profit or Loss From Business,

attached to his Form 1040, U.S. Individual Income Tax Return.  The first year

after petitioner returned to the seed business it reported a $193,371 loss.  The seed

business subsequently generated net profits of $109,247, $106,552, $234,176,

$151,175, and $84,772 in 2006, 2007, 2008, 2009, and 2010, respectively.

### B. Den Besten Cutting Horses

Petitioner's cutting horse activity includes breeding, raising, boarding,

training, and selling registered cutting horses,[4] as well as showing in national

cutting horse competitions.  Petitioner has been working with cutting horses since

1986.  During the years in issue petitioner's cutting horse activity occurred

primarily at his nine-acre residence, where he had built multiple barns.  In 1983

---

[4]A "cutting horse", although not a specific breed, is typically an American quarter horse that has been developed through superior breeding and careful training to isolate and remove a single animal from a larger herd.  Cutting horses were originally prized on working ranches for their ability to cut, or separate, individual cows from the herd.  A horse's skills can be showcased through timed competitions that mimic ranch work.  See Welch v. Commissioner, T.C. Memo. 2017-229, at *14 n.14; Introduction, National Cutting Horse Association, https://nchacutting.com/about-us/introduction (last visited Oct. 10, 2019).

[*5] when he purchased the property, it had only a single hay barn. Petitioner improved his property by adding a foaling barn for the breeding operation.[5] See infra pp. 8-10. Petitioner also constructed a 100 x 200 foot riding arena along with 20 horse stalls and a heated wash bay. Petitioner used the riding arena to host roping and cutting horse competitions. Arena time was also available to other trainers to work their own cutting horses.

A typical cutting horse competition starts with practice rounds on a Friday followed by competition events all day on Saturday and Sunday. In a cutting horse competition the rider attempts to isolate or "cut" one cow from a herd of cattle with the goal of preventing the "cut" cow's returning to the herd, which is the cow's natural instinct. The rider stays in line with the horse's movements and the rider and horse work as a synchronized unit. The rider is judged on how well

---

[5]Some common terms in the horse industry include: (1) "foals", which are young horses; (2) "yearlings", which are horses between one and two years old; (3) "mares", which are female horses; (4) "broodmares", which are mature females expecting or nursing a foal; (5) "stallions", which are mature male horses that when used for breeding are referred to as "studs"; (6) "dams", which are the female parents of horses; and (7) "sires", which are the male parents of horses. Welch v. Commissioner, at *14 n.13.

[*6] the horse anticipates and reacts to the cow, as well as how the rider and horse work as a unit.[6]

Over the years petitioner achieved national success as a cutting horse competitor. He competed in nonprofessional or amateur classes and earned winnings totaling over $50,000 from 1999 to 2006. In 1997 petitioner's horse, Rosie O Llama, was named the American Quarter Horse Association (AQHA) World Champion Cutting Horse with earnings totaling over $22,000 as of 2001. Rosie O Llama was a proven sire of champion horses such as Rosies Ark, which won over $45,000 on the amateur circuit. In 1998 petitioner repeated his success with another AQHA world champion cutting stallion named Si Olena with earnings of $100,000 as of 2000. Si Olena was second generation from a cutting horse dynasty by Doc O'Lena, whose collective progeny had won millions in prize earnings.

Petitioner, along with his daughter, traveled to and participated in approximately 12 competitions per year throughout seven States in the upper Midwest. Petitioner and his daughter would often compete in classes at different levels with the same horse, thus showcasing the horse's cutting skills and

_____

[6]See Judging, National Cutting Horse Association, https://nchacutting.com/about-us/judging (last visited on Oct. 11, 2019).

**[*7]** providing more training and exposure for the horse.  Petitioner made the determinations as to which of his horses would compete, the class, and the level in which he and his daughter would compete, as well as the number of entries per competition.  Typically his daughter competed in one event on her father's horse while petitioner competed in multiple events.

### 1.    Yellow Rose and Horse Sales

Following his national success in 1997 petitioner began to expand his operation.  Petitioner purchased and remodeled an existing professional facility, the Yellow Rose, which included a 350 x 100 foot arena with a cafe and bar.  The facility added 100 horse stalls to petitioner's existing 20 stalls.  Petitioner hosted regional cutting horse competitions and production sales at the facility.  People would travel from multiple States to purchase cutting horses or compete at the arena.  The Yellow Rose was home to the Dakota Classic Cutting Futurity,[7] as well as to six to eight other cutting horse competitions in a given year.

---

[7]The National Cutting Horse Association (NCHA) World Champion Futurity is for cutting horses what the Kentucky Derby is for thoroughbreds. Rounding out the cutting horse "triple crown" are the Super Stakes and the Summer Cutting Spectacular.  There are NCHA competitions leading up to the major events.  NCHA Shows, National Cutting Horse Association, https://nchacutting.com/about-us/ncha-shows (last visited Oct. 11, 2019).

**[*8]** The horse production sales hosted at the Yellow Rose were live auctions in which high-quality livestock were offered for sale to the public. Extensive published auction catalogs provided detailed information about each horse's pedigree, its sire and dam, a general description, and any achievements. As the host of the sales event petitioner coordinated with other breeders from across the nation to present stock by consignment sale arrangements. The dams and sires referenced in the sales were outstanding stock from champion bloodlines.

Petitioner advertised veterinary services, recommended air charters for the transportation of sold horses, advertised insurance providers for horses purchased, and provided sales photography and absentee phone bidding services. Petitioner engaged a livestock brokerage company and its sales representatives and auctioneers for the auctions. The horses sold included futurity prospects, yearlings, stallions, foals, broodmares, and proven geldings with world-class bloodlines. Petitioner handled several hundred horses during those auctions, including consignments and his own bloodlines.

2. Breeding Operation

Petitioner also expanded his operations by breeding cutting horses. Petitioner's two world-champion stallion cutting horses, Rosie O Llama and

[*9] Si Olena, both from champion bloodlines, were the focal points of the breeding operation and had the potential to produce high-winning progeny. High-winning progeny increased the value of the sire, which in turn increased the sire's stud fee.

Petitioner's stallion service contracts were for live cover breeding programs and charged an initial stud fee of at least $1,500 to $2,000 per mating. Petitioner was an experienced stallion handler, and this type of breeding operation is inherently dangerous and requires constant vigilance for extended periods through each mare's breeding cycle and careful physical control of the stallion during mating to ensure success and the safety of both horses. Petitioner was also qualified to handle artificial insemination programs. Petitioner also oversaw delivery of the foals (known as "foaling"). Petitioner at one time owned 20 broodmares, including broodmares from other proven champion bloodlines. He was also paid to breed other mares with his champions.

Petitioner trained the foals born to his mares, but as they progressed, at times he hired expert trainers from across the nation to help with advanced training. The initial training phase for a cutting program takes approximately 12 to 18 months. Then training requires additional years to get the horse seasoned, which is accomplished by the horse's competing in multiple NCHA-sanctioned

[*10] events and competitions.  It takes a significant amount of time and effort to train a horse for competition, with no guarantees as to how it ultimately will perform.

### 3.  Management Operations

At times petitioner had additional employees to support his cutting horse activity, including a general manager, a breeding manager, and an assistant trainer, primarily when he ran the Yellow Rose.  He also had an occasional bookkeeper to help with general recordkeeping tasks.  He retained a certified public accountant (CPA) with 30 years of experience to prepare his tax returns.  He obtained advice from a lawyer regarding drafting contracts to cover breeding rights and obligations as well as foal ownership.  He routinely read about and researched cutting horses and bloodlines and spoke with other horse breeders at competitions and sales events, thus maintaining national connections in the cutting horse industry.

Petitioner testified that he treated the cutting horse activity like a business and kept records in the same manner as his father had taught him.  He used canceled checks and his bank statements to track income and expenses and compiled a yearend list for his accountant.  Before the years in issue, while petitioner owned the Yellow Rose, he had maintained a separate checking account and filed a separate Schedule C for the Yellow Rose.  For the years in issue

[*11] petitioner maintained a combined checking account for his horse activity and his personal affairs.

Petitioner credibly testified it was standard operation for trainers and hay farmers to conduct business by handshake in that particular area, and it was uncommon to receive receipts or invoices from service providers. He would pay by check when hay was delivered or training services were performed. However, petitioner kept extensive breeding records, which were required for sales and national registration. Petitioner had owned and trained nationally recognized cutting horses, and his goal was to breed and train second and third generation nationally recognized cutting horses.

Petitioner's two world-champion horses, the cutting horse competitions he hosted at the Yellow Rose, and the yearly futurity earned brand name recognition for horses he bred. He advertised his horses as Den Besten bred stock through the use of printed advertisements in programs and sales catalogs, and sold items at shows (i.e., blankets or belt buckles with petitioner's name or brand). As another method of advertising and promotion petitioner marked some of his horses with his brand,[8] forever marking them as Den Besten bred stock. At competitions large

---

[8]A brand is a mark of ownership generally registered with the State and used by ranchers to identify their livestock operations. The brand, like a tattoo, is

(continued...)

[*12] banners were displayed for both his seed business and his cutting horses. Petitioner specifically advertised at cutting horse competitions a product he developed called "Ultra Green Floor Sweep", which he invented while working with his horses. The product is extruded soybean meal formula and is U.S. Government approved, and as of the time of trial petitioner had a pending patent application. Petitioner can use it to keep the dust down while sweeping his horse barns, and it is also safe if the horse eats it.

### 4. Cutting Horse Activity Reduction

Income from winnings, breeding fees, shows, and arena fees increased from $4,000 in 1996 to an average of approximately $129,000 from 1999 to 2004. However, petitioner's cutting horse expansion was cut short by the untimely death of his world champion Si Olena and his return to the floundering seed business in 2005. Petitioner sold the Yellow Rose facility and invested the proceeds in the assets of the seed business in an attempt to stabilize the seed business. As a result petitioner began to scale back the cutting horse activity. While he continued to own, breed, and train horses and compete in cutting horse competitions, he significantly reduced the operation. At one time petitioner had at least 20

---

[8](...continued)
permanent and highly visible on the animal. In South Dakota the State regulates brand registration.

[*13] broodmares and multiple stallions. Although he continued to devote considerable time breeding approximately 12 mares per season along with foal delivery and veterinary work, he reduced his livestock numbers after he returned to the seed business, which consumed more and more of his time in his attempt to save it. As of 2006 petitioner owned approximately 10 horses, and by 2016 he had 7 or fewer horses. Among petitioner's current remaining horses was a champion-bred promising young stallion in training, and petitioner had high hopes for the horse. Despite petitioner's nationally recognized cutting horse activity, he has reported a loss for every taxable year since 1997 when he purchased the Yellow Rose.

## II.    Tax Returns

For each year in issue petitioner reported his cutting horse activity on Schedule F, Profit or Loss From Farming. Petitioner reported his seed business during the same years on Schedule C. In addition he claimed an NOL carryover partially attributable to his Schedules C from 2003 and 2005 affecting each year in issue.

For 2006 petitioner reported a Schedule C profit of $109,247 and a Schedule F loss of $93,043, of which $44,491 was depreciated assets. Petitioner also reported an NOL carryover of $286,746.

[*14] For 2007 petitioner reported a Schedule C profit of $106,552 and a Schedule F loss of $97,456, of which $42,717 was depreciated assets. Petitioner also reported an NOL carryover of $281,792.

For 2008 petitioner reported a Schedule C profit of $234,176 and a Schedule F loss of $86,730, of which $25,409 was depreciated assets. Petitioner also reported an NOL carryover of $281,792.

For 2009 petitioner reported a Schedule C profit of $151,175 and a Schedule F loss of $73,867, of which $19,444 was depreciated assets. Petitioner also reported an NOL carryover of $155,372.

For 2010 petitioner reported a Schedule C profit of $84,772 and a Schedule F loss of $56,709, of which $9,461 was depreciated assets. Petitioner also reported an NOL carryover of $97,217. Since 1997 petitioner has reported a Schedule F loss for each year.

On January 14, 2015, respondent issued petitioner the notice of deficiency determining deficiencies in Federal income tax and accuracy-related penalties under section 6662(a) for 2006, 2007, 2008, 2009, and 2010 and additions to tax

**[\*15]** under section 6651(a)(1) for 2006 and 2007.[9]  Petitioner timely petitioned the Court for redetermination of the deficiencies, penalties, and additions to tax.

OPINION

Generally, the Commissioner's determination of a deficiency is presumed correct, and the taxpayer bears the burden of proving it incorrect.  See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  Moreover, deductions are a matter of legislative grace, and the taxpayer bears the burden of proving his entitlement to any deductions claimed.  INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934).

Under certain circumstances the burden of proof as to factual matters may shift to the Commissioner pursuant to section 7491(a).  Petitioner did not argue for a burden shift under section 7491(a), and the record does not establish that the prerequisites to shift the burden have been met; therefore, the burden of proof remains with petitioner.

_____

[9]Petitioner signed Forms 872, Consent to Extend the Time to Assess Tax, on June 7, 2012, April 4, 2013, and May 9, 2014, to extend the assessment period of limitations to December 31, 2015, for his timely filed 2008, 2009, and 2010 Federal income tax returns and his untimely filed 2006 and 2007 Federal income tax returns.

[*16] I.     Whether the Cutting Horse Activity and the Seed Business Were One Activity

The Court must decide whether petitioner engaged in the cutting horse activity with the intent of making a profit. A taxpayer who carries on a trade or business may deduct ordinary and necessary expenses paid in connection with the operation of the business. Sec. 162(a). Section 183 disallows certain deductions attributable to an activity not engaged in for profit. Section 183(c) defines an activity not engaged in for profit as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212."

To determine whether and to what extent section 183 and the regulations thereunder apply, the activities of the taxpayer must be ascertained. Sec. 1.183-1(d), Income Tax Regs. Where a taxpayer is involved in multiple undertakings, each may be a separate activity, or they may constitute a single activity. Id.

Positions taken by a taxpayer in a tax return are treated as admissions and cannot be overcome without proof that they are erroneous. Topping v. Commissioner, T.C. Memo. 2007-92, 2007 WL 1135339, at *9 (citing Mendes v. Commissioner, 121 T.C. 308, 312 (2003), and Estate of Hall v. Commissioner, 92

**[*17]** T.C. 312, 337-338 (1989)).  Reporting activities on separate schedules is an admission that the taxpayer views the activities as separate.  See id.  Here, petitioner must overcome a high hurdle to establish that the cutting horse activity and the seed business were a single activity.  During the years in issue petitioner reported his cutting horse activity on Schedule F and his seed business on Schedule C.  By petitioner's filings he has admitted the two activities were separate and therefore must now prove that characterization was erroneous.

In ascertaining a taxpayer's activities, all the facts and circumstances of the case must be taken into account.  Sec. 1.183-1(d), Income Tax Regs.  Petitioner contends that his seed business and cutting horse activity are interconnected and thus one activity.  He points to his invention of the Ultra Green Floor Sweep product while working with his horses and that he advertises both activities at cutting horse competitions.  The Court does not need to consider the significant factors and circumstances outlined in regulations and supporting caselaw, as petitioner's brief reflected that his businesses were "altogether different".  Even if there is some interconnection between the two activities with common clients and advertising, the record supports that the activities were different.  Petitioner kept separate staff and banking records and filed separate tax schedules for each

**[*18]** activity. Thus, the Court considers his cutting horse activity separate and apart from his seed business.

## II. Cutting Horse Activity

Breeding, raising, training, and showing horses may be an activity entered into for profit pursuant to section 162. See Engdahl v. Commissioner, 72 T.C. 659, 665-666 (1979). Such a determination will depend upon whether the taxpayer engaged in the activity with the primary purpose of making a profit. See id. at 666; Dunn v. Commissioner, 70 T.C. 715, 720 (1978), aff'd, 615 F.2d 578 (2d Cir. 1980); Jasionowski v. Commissioner, 66 T.C. 312, 319 (1976). A reasonable expectation of profit is not required, but the facts and circumstances must indicate that the taxpayer entered into the activity or continued the activity with the actual and honest objective of making a profit. Sec. 1.183-2(a), Income Tax Regs.; see also Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), aff'd without published opinion, 702 F.2d 1205 (D.C. Cir. 1983); Engdahl v. Commissioner, 72 T.C. at 666; Feldman v. Commissioner, T.C. Memo. 1986-287, 1986 Tax Ct. Memo LEXIS 321, at *16. Evidence from years outside the years in issue can be relevant if it provides context to evaluate the taxpayer's overall requisite profit motive. Donoghue v. Commissioner, T.C. Memo. 2019-71, at *23; see Smith v. Commissioner, T.C. Memo. 1993-140 (considering profits and losses

**[*19]** in subsequent years to have probative, although not determinative, significance).

The Court must consider all facts and circumstances in determining whether a taxpayer has a profit objective. Sec. 1.183-2(b), Income Tax Regs. There are nine nonexclusive factors to consider: (1) the manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisors; (3) the taxpayer's time and effort expended in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the taxpayer's success in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) the presence of personal pleasure or recreation. Id. No single factor or even a majority of the factors is controlling, and all of the facts and circumstances must be evaluated, giving greater weight to objective facts than to the taxpayer's statement of intent. Keating v. Commissioner, 544 F.3d 900, 904 (8th Cir. 2008), aff'g T.C. Memo. 2007-309; Evans v. Commissioner, 908 F.2d 369, 373 (8th Cir. 1990), rev'g T.C. Memo. 1988-468; Golanty v. Commissioner, 72 T.C. 411, 426 (1979), aff'd without published opinion, 647 F.2d 170 (9th Cir. 1981); see also sec. 1.183-2(a), Income Tax Regs. The Court considers each factor in turn.

**[\*20]** A.     <u>Manner in Which the Taxpayer Carried On the Activity</u>

The fact that a taxpayer carries on an activity in a businesslike manner may indicate a profit objective. <u>See</u> sec. 1.183-2(b)(1), Income Tax Regs. Courts review a taxpayer's business plan, books and records, abandonment of unprofitable techniques and adaptation of new techniques, and means of advertisement to determine whether the taxpayer carried on the activity in a businesslike manner. <u>See</u> <u>id.</u>; <u>see also</u> <u>Burger v. Commissioner</u>, 809 F.2d 355, 359 (7th Cir. 1987), <u>aff'g</u> T.C. Memo. 1985-523; <u>Golanty v. Commissioner</u>, 72 T.C. at 430-431; <u>Dodge v. Commissioner</u>, T.C. Memo. 1998-89, <u>aff'd without published opinion</u>, 188 F.3d 507 (6th Cir. 1999).

       1.     <u>Business Plan and Records</u>

Having a business plan may suggest that a taxpayer conducted the activity in a businesslike manner. <u>See</u> <u>Sanders v. Commissioner</u>, T.C. Memo. 1999-208, 1999 WL 416975, at \*7; <u>Phillips v. Commissioner</u>, T.C. Memo. 1997-128. A business plan need not be written or oral; it can be evidenced by a taxpayer's action. <u>See</u> <u>Dennis v. Commissioner</u>, T.C. Memo. 2010-216; <u>Phillips v. Commissioner</u>, T.C. Memo. 1997-128. While a taxpayer is not required to maintain a sophisticated system of accounting, records should be maintained in a manner that enables the taxpayer to make informed decisions. <u>Burger v.</u>

[*21] Commissioner, 809 F.2d at 359; McKeever v. Commissioner, T.C. Memo. 2000-288, 2000 WL 1297710, at *10.

Petitioner's business plan is evidenced by his actions. Petitioner's plan was to build upon his established reputation in the cutting horse industry and increase recognition of his brand through his horses' continued superior performances at cutting horse competitions. In order to carry out this plan he purchased and bred quarter horses to train into winning cutting horses. He did achieve success by having two world champion horses. His plan included building facilities to support his breeding, training, and cutting horse showing activities. His purchase of the Yellow Rose was part of his plan to further expand as he hosted regional and national events and production sales at his own professional facility. In turn, his plan to build upon his reputation and increase his brand recognition would lead to higher stud fees for his breeding operation and higher fees for his training activity. While petitioner's plan was not formally written, it can be inferred, from his deliberate actions to achieve a narrowly focused goal, that he did have a plan. This factor favors petitioner's having a profit objective.

2. Recordkeeping

Maintaining complete and accurate books and records may indicate that a taxpayer has engaged in an activity for profit. See sec. 1.183-2(b)(1), Income Tax

[*22] Regs. At a minimum the taxpayer's books and records must contain the basic information required to make educated business decisions. See Burger v. Commissioner, 809 F.2d at 359. The effect of the taxpayer's failure to keep complete records may vary, depending on other facts. In some circumstances mere "shoebox" recordkeeping done in an "unprofessional and disorganized manner that would have satisfied no prospective investor" may be found adequate because it allows the taxpayer to know whether the business is profitable. Helmick v. Commissioner, T.C. Memo. 2009-220, 2009 WL 3012725, at *8.

Although respondent stressed that petitioner's seed business records were more extensive, it operated as an interstate and cross-border company which as a separate activity required more extensive records. Petitioner's recordkeeping for the cutting horse activity primarily included retention of canceled checks and bank statements that included his purchases and income related to the cutting horse activity. He compiled a yearend list of those canceled checks and bank statements, resulting in a list of cutting horse activity income and expenses for the year. Petitioner's CPA used the list to prepare petitioner's tax return each year. In addition petitioner maintained breeding records and training records. Breeding records are required for national registration and were listed for horses in petitioner's production sales catalog going back at least two generations. He also

[*23] periodically secured legal services to review breeding contracts, which determine the ownership rights to foals and future breeding rights. He also occasionally employed a bookkeeper to help with recordkeeping.

In the agricultural business it is not unusual to see no maintenance of records other than canceled checks and deposit slips. See Edge v. Commissioner, T.C. Memo. 1973-274, 1973 Tax Ct. Memo LEXIS 13, at *21 (declining to weigh against a farmer for his minimal recordkeeping system when it was no less stringent than what other farmers in the area used and worked for his particular operation). The records petitioner maintained were consistent with his business profit objective and enabled him to make educated business decisions about his cutting horse activity. This factor favors petitioner's having a profit objective.

### 3. Change in Operating Methods

A taxpayer's change of operating methods, adoption of new techniques, or abandonment of unprofitable methods may indicate a profit objective. Sec. 1.183-2(b)(1), Income Tax Regs. After his championships in 1997 and 1998, petitioner acquired and remodeled the Yellow Rose, expanding his operation. This significant acquisition enabled him to expand into hosting cutting horse competitions and production sales. It also increased his boarding and training capacities. He sold his seed business in order to increase the effort and time he

[*24] needed to coordinate these efforts and to train potential foals. The Court concludes these actions are strongly indicative of petitioner's having a profit motive during this timeframe preceding the years in issue. The actions are consistent with an intent to improve profitability through new operating methods.

Even though petitioner owned and operated the Yellow Rose outside the years in issue, he recognized he had to sell it to generate time and capital to save the seed business. Petitioner reduced his operation on the basis of economic realities and entered into a winding-down period with respect to the cutting horse activity. Petitioner's realization he needed to scale down his operation is also indicative of a profit motive. This factor favors petitioner's having a profit objective.

### 4. Advertising

A taxpayer may further exhibit his profit objective by the manner in which he advertises his business. A single form of substantial advertisement itself may not establish that a taxpayer has carried on his activity in a businesslike manner. See McKeever v. Commissioner, T.C. Memo. 2000-288; Cohn v. Commissioner, T.C. Memo. 1983-301, 1983 Tax Ct. Memo LEXIS 486, aff'd, 742 F.2d 1432 (2d Cir. 1984). Different kinds of advertising media may allow the taxpayer "[t]o expand * * * [his] potential market and to attract new individuals". Cohn v.

[*25] Commissioner, 1983 Tax Ct. Memo LEXIS 486, at *22. Horse shows may be an effective advertising method. See Engdahl v. Commissioner, 72 T.C. at 662-663; Dodge v. Commissioner, T.C. Memo. 1998-89.

Petitioner displayed banners at competition events advertising both his seed business and his cutting horse activity, and he had advertisements in printed programs and sales catalogs. Petitioner sold advertisement items such as blankets and belt buckles marked with his brand name and talked with people across the nation regarding his horses, all of which resulted in sales, breeding, and training opportunities. Petitioner marked his operation with his own unique brand. He used his brand on advertisement items, in production sales catalogs, and even on some of the horses he bred.

Overall, petitioner conducted his cutting horse activity in a businesslike manner. Accordingly, this factor favors petitioner's having a profit objective.

B.      Expertise of Taxpayer and His Advisers

Preparation for the activity by extensive study of its accepted business, economic, and scientific practices or consultations with industry experts may indicate a profit objective where a taxpayer carries on the activity in accordance with such practices. See sec. 1.183-2(b)(2), Income Tax Regs.

[*26] Petitioner has a high level of expertise in the care, training, and competing of cutting horses, including their feeding, breeding, foaling, training, competing, and selling. His efforts resulted in two champion cutting horses and at least eight futurity prospects. His production sales attracted national attention. He offered purchases by telephone, and consignors traveled to list their horses in his production sales. In addition, he had a network of trainers to assist him. Petitioner had been a respected businessman in a related business for years. Thus, this factor favors petitioner's having a profit objective.

C.     Taxpayer's Expended Time and Effort

The amount of time and effort a taxpayer spends on the activity is indicative of his profit objective. The fact that the taxpayer devotes much of his personal time and effort to carrying on the activity may indicate an intention to make a profit. Sec. 1.183-1(b)(3), Income Tax Regs. A taxpayer's withdrawal from another occupation to devote most of his time and energy to the activity may also be evidence that the activity is engaged in for profit. Id. Moreover, there is no requirement that for an activity to be engaged in for profit it be the taxpayer's sole, or even primary, occupation. When evaluating the time and effort a taxpayer dedicated to horse activities, the relevant inquiry is the amount of time and effort

[*27] contributed above and beyond the amount generally required to sustain a hobby. Betts v. Commissioner, T.C. Memo. 2010-164.

During the years in issue petitioner spent a considerable amount of time breeding approximately 12 mares per season, delivering the foals, and performing veterinary work on his horses as needed. Petitioner had engaged in an extensive stallion service contracts for live cover breeding program, which required vigilance through the mares' breeding cycles and careful physical control of the stallions during mating. Petitioner's dedication to the oversight of the successful breeding program extend well beyond that of a mere hobbyist.

While unforeseen events forced petitioner to scale back his activities, the Court cannot overlook the size and depth of his cutting horse activity leading up to the years in issue. This factor favors petitioner's having a profit objective.

D.    Expectation That the Activity Assets May Appreciate

An expectation that assets used in the activity will appreciate in value and therefore may produce an overall profit indicates a profit motive even if the taxpayer derives no operational profit. Sec. 1.183-2(b)(4), Income Tax Regs. Such an expectation becomes less speculative when a taxpayer shows successes that could plausibly lead to appreciation. Hoyle v. Commissioner, T.C. Memo. 1994-592, 68 T.C.M. (CCH) 1321 (1994). This Court has previously stated that a

[*28] bona fide expectation that assets in a horse activity may appreciate can explain a taxpayer's willingness to sustain continued losses even though "total appreciation in value may or may not offset the aggregate operating losses incurred." Engdahl v. Commissioner, 72 T.C. at 668-669.

Horses can appreciate in value in two ways. They can develop the necessary skills to become better competitors, thus winning larger amounts, or they can become breed stock. See Annuzzi v. Commissioner, T.C. Memo. 2014-233, at *24. Breed stock generates income through breeding fees and/or by producing offspring that can be trained and/or sold.

Petitioner had a bona fide expectation that his horses, new foals, breeding fees, and ranch operations would all substantially increase in value over time. Petitioner had two world champion cutting horses in 1997 and 1998, both of which were stallions from champion bloodlines, whose sires had already produced progeny that had won millions in prize earnings. Petitioner's broodmares were also from championship bloodlines. This Court finds it reasonable that petitioner could have expected substantial income from Si Olena and Rosie O Llama as well as from his other breed stock.

Petitioner's success in 1997 and 1998, coupled with the acquisition of the new and improved professional training facility, supports a bona fide belief that

[*29] his existing horses, future foals, breeding fees, and the Yellow Rose all would have appreciated substantially. To this end, income from winnings, breeding fees, shows, and arena fees did increase from $4,000 in 1996 to an average of approximately $129,000 from 1999 to 2004. Therefore, petitioner arguably would have had a bona fide expectation that the assets involved would have sufficiently appreciated when he purchased the Yellow Rose. Additionally, petitioner had made substantial improvements to his property--a foaling barn, a riding arena, horse stalls, and a heated wash bay--and would have had a bona fide expectation that they would appreciate in value.

The unanticipated sale of the Yellow Rose because of petitioner's son's struggles with the seed business, coupled with the untimely death of his world champion cutting horse, reduced the potential appreciation. Petitioner responded to these unforseen events by beginning to reduce his stock through sales and by making adjustments to his cutting horse activity. However, at the time of trial, petitioner had a promising champion-bred young stallion. It generally takes only one good horse to be successful. Consequently, this factor is neutral.

E. Taxpayer's Success in Carrying On Similar or Dissimilar Activities

A taxpayer's success in other business ventures may indicate that the taxpayer has the entrepreneurial skills and determination to succeed in subsequent

[*30] endeavors.  This in turn may help demonstrate that his present objective is profit.  Sec. 1.183-2(b)(5), Income Tax Regs.; see also Rabinowitz v. Commissioner, T.C. Memo. 2005-188; Daugherty v. Commissioner, T.C. Memo. 1983-188.  A court can infer that a taxpayer's diligence, initiative, foresight, and other qualities will generally lead to success in other business activities if he has demonstrated those qualities by starting his own business and turning that business into a relatively large and profitable enterprise.  See Daugherty v. Commissioner, T.C. Memo. 1983-188.

Petitioner successfully operated his seed business.  In 2002 he sold the business to his son for approximately $4.3 million.  After his son encountered financial difficulties, petitioner returned to the seed business once again, turning it into a profitable business.

The cutting horse activity is altogether different from the seed business, but the potential consumer audience in the agricultural setting is substantially similar. Petitioner advertised both businesses to a joint audience at horse competitions.  He was using the business acumen acquired from operating the seed business to grow his brand and cutting horse activity.  Because petitioner was successful in the seed business, the Court finds this factor favors his having a profit objective.

**[\*31]** F.    <u>History of Income and Losses With Respect to the Activity</u>

A history of substantial losses may indicate that the taxpayer did not conduct the activity for profit. Sec. 1.183-2(b)(6), Income Tax Regs.; <u>see</u> <u>Golanty v. Commissioner</u>, 72 T.C. at 427. A series of losses during the initial or startup phase of an activity may not necessarily indicate that the activity is not engaged in for profit. Sec. 1.183-2(b)(6), Income Tax Regs. This Court has generally held that the startup phase for horse-related activities may be 5 to 10 years. <u>See</u> <u>Engdahl v. Commissioner</u>, 72 T.C. at 661; <u>Routon v. Commissioner</u>, T.C. Memo. 2002-7; <u>McKeever v. Commissioner</u>, T.C. Memo. 2000-288. As this Court has noted before, horse breeding and performance are speculative activities which with the right horse could result in substantial income. <u>See</u> <u>Welch v. Commissioner</u>, T.C. Memo. 2017-229, at \*37-\*38.

Where losses continue to be sustained beyond the period customarily necessary to bring such an operation to profitable status, the continued losses, if not explainable as due to "customary business risks or reverses" or to "unforeseen or fortuitous circumstances which are beyond the control of the taxpayer", may indicate that the activity is not being engaged in for profit. Sec. 1.183-2(b)(6), Income Tax Regs.; <u>see</u> <u>Engdahl v. Commissioner</u>, 72 T.C. at 669; <u>see also</u> <u>McKeever v. Commissioner</u>, T.C. Memo. 2000-288.

[*32] As of the time of trial, the cutting horse activity had not produced a profit in any taxable year. Petitioner had reported consecutive years of losses since 1997. Thus, petitioner has a history of losses with respect to his cutting horse activity. But in comparison, when petitioner sold the seed business to his son, it had also reported nonpassive losses and suspended losses from prior years.

This history is mitigated somewhat by circumstances beyond petitioner's control. As previously discussed, petitioner's plans to devote all of his time to his cutting horses after he sold his seed business were cut short because of the floundering seed business. This unforseen situation required petitioner to sell the Yellow Rose to free up the capital needed to salvage the seed business. Petitioner attributed some of these losses to his decision to increase his total horse ownership in the late 1990s to early 2000s, the height of his horse activities. However, this resulted in increased losses when he sold those horses in a diminished horse market as a result of the necessary rapid reduction of the herd.

This factor favors respondent.

G.    The Amount of Occasional Profits

A taxpayer's derivation of some profit from an otherwise money-losing venture may support the existence of a profit motive. See sec. 1.183-2(b)(7), Income Tax Regs. Moreover, "an opportunity to earn a substantial ultimate profit

[*33] in a highly speculative venture is ordinarily sufficient to indicate that the activity is engaged in for profit even though losses or only occasional small profits are actually generated." Id. The regulations cite a wildcat oil drilling venture as an example of an activity in which an honest profit motive may be founded on a "small chance that * * * [the taxpayer] will make a large profit." Id. para. (c), Example (5). The Court has previously described a horse-related activity as a highly speculative venture. See Dawson v. Commissioner, T.C. Memo. 1996-417, 1996 Tax Ct. Memo LEXIS 435, at *12 (finding that the taxpayer's belief that a champion horse could generate substantial profits supported the existence of a profit objective).

Petitioner arguably had the opportunity to earn a substantial profit after winning two world championships and purchasing the Yellow Rose. During the period of winnings and ownership of the Yellow Rose petitioner's aggregate losses were significantly lower, and his horses and property both had significantly greater appreciation potential. Petitioner's reduction in his cutting horse activity after his return to the seed business and his champion stallion's unexpected death largely diminished his profit potential. Petitioner did not realize a profit on his Schedule F during the years in issue; therefore, this factor favors respondent.

[*34] H.     Taxpayer's Financial Status

The fact that the taxpayer does not have substantial income or capital from sources other than the activity may indicate that an activity is engaged in for profit. Sec. 1.183-2(b)(8), Income Tax Regs.; see also Helmick v. Commissioner, T.C. Memo. 2009-220; Rozzano v. Commissioner, T.C. Memo. 2007-177; Phillips v. Commissioner, T.C. Memo. 1997-128. Tax benefits resulting from the activity do not compel a conclusion that a taxpayer engaged in an activity without a profit objective. See Engdahl v. Commissioner, 72 T.C. at 670. More importantly, the inquiry should be focused upon whether petitioner had a genuine profit objective. See id.

From 2006 to 2010 petitioner reported average Schedule C business income from the seed business of approximately $137,000. Petitioner's returns showed substantial tax losses for each year in issue, attributable to claimed NOL carryovers and losses. However, petitioner's son had defaulted on payments with respect to the 2002 sale of the corporate seed business. Additionally, petitioner sold assets and expended significant funds attempting to salvage the seed business. By 2006 the seed business once again earned profits, so petitioner reported income from the seed business and offset it with losses from the cutting horse activity. However, the Court finds that petitioner was not in a financial

**[*35]** position that would have enabled him to continue suffering losses without a bona fide profit motive. Moreover, the Court is not persuaded that petitioner abandoned his profit motive with respect to the cutting horse activity. Petitioner had a promising champion-bred stallion in training. Petitioner genuinely believes that one good horse could turn a profit for his horse activity. Accordingly, this factor favors petitioner's having a profit objective.

I.        Elements of Personal Pleasure and Recreation

Evidence that a taxpayer derives personal pleasure from an activity, or finds it recreational, may suggest that he engages in it for reasons other than making a profit. See sec. 1.183-2(b)(9), Income Tax Regs. The derivation of personal pleasure, however, "is not sufficient to cause the activity to be classified as not engaged in for profit if the activity is in fact engaged in for profit as evidenced by other factors". Id. "[A] business will not be turned into a hobby merely because the owner finds it pleasurable; suffering has never been made a prerequisite to deductibility." Jackson v. Commissioner, 59 T.C. 312, 317 (1972).

Petitioner's cutting horse activity was physically demanding. He coordinated multi-State production sales and competition events. His breeding operation required constant attention to the mares and stallions for a successful breeding cycle. While he surely derived personal pleasure from the recreational

[*36] aspects of the cutting horse activity, his efforts went well beyond the leisurely aspects of horseback riding or the routine tasks of caring for horses.

At trial petitioner testified he was born in 1942, so he was approximately 64 years old in 2006, the first year in issue. He was 56 in 1998, when he acquired the Yellow Rose. Though petitioner admitted he enjoyed riding the horses during the years in issue, he also stated that his enjoyment has lessened as he has aged. Additionally, petitioner hired multiple trainers to aid in training his horses; he could not be deemed to have engaged in the cutting horse activity solely for personal enjoyment when the horses were not always in his care.

Petitioner rode to train his horses, not for recreation. He worked to prepare his horses for competitions in hopes of raising profitability and his overall reputation in the cutting horse industry. See Phillips v. Commissioner, 1997 Tax Ct. Memo LEXIS 140, at *39 (concluding that taxpayers rode their horses solely to prepare them to race, for sale, or for show, and did not engage in the horse activity for its recreational or personal aspects). Therefore, this factor favors petitioner.

J.    Cutting Horse Activity Conclusion

Considering all the relevant facts and circumstances the Court finds that six factors favor petitioner's having a profit objective, one factor is neutral, and two

[*37] factors favor respondent. The two factors that favor respondent do not outweigh the factors that favor petitioner's having a profit objective. Rather, petitioner's actions, coupled with his sincere and credible testimony as to his business goals, overwhelmingly support his claim that he has a bona fide profit objective. Accordingly, the Court concludes that petitioner engaged in the cutting horse activity with a profit objective during the years in issue.

III.     Substantiation of Trade or Business Expenses and Net Operating Losses

A.     Reported Expenses

A taxpayer may deduct all ordinary and necessary expenses paid or incurred in a taxable year in carrying on any trade or business. Sec. 162(a); see Commissioner v. Lincoln Sav. & Loan Ass'n, 403 U.S. 345, 352 (1971). A trade or business expense is ordinary if it is normal or customary within a particular trade, business, or industry, and it is necessary if it is appropriate and helpful for the development of the business. Commissioner v. Heininger, 320 U.S. 467, 471 (1943); Welch v. Helvering, 290 U.S. at 113.

A taxpayer is required to substantiate expenses underlying each claimed deduction by maintaining records sufficient to establish the amount of the expense to enable the Commissioner to determine the correct tax liability. See sec. 6001; Higbee v. Commissioner, 116 T.C. 438, 440 (2001); sec. 1.6001-1(a), Income Tax

**[*38]** Regs.  In addition the taxpayer bears the burden of substantiating the amount and purpose of the claimed deduction.  Higbee v. Commissioner, 116 T.C. at 440; Hradesky v. Commissioner, 65 T.C. 87, 89-90, aff'd, 540 F.2d 821 (5th Cir. 1976). The fact that a taxpayer claims a deduction on his income tax return is not sufficient to substantiate the deduction.  Wilkinson v. Commissioner, 71 T.C. 633, 639 (1979); Roberts v. Commissioner, 62 T.C. 834, 837 (1974).

While business expenses for the production of income are generally deductible, personal, living, and family expenses are typically not.  See sec. 262(a).  A business expense for which a deduction is claimed must be incurred primarily for business rather than for personal reasons.  See Walliser v. Commissioner, 72 T.C. 433, 437 (1979).  Where an expense exhibits both personal and business characteristics, the "test * * * requires a weighing and balancing of all the facts * * * bearing in mind the precedence of section 262, which denies deductions for personal expenses, over section 162, which allows deductions for business expenses."  Sharon v. Commissioner, 66 T.C. 515, 524 (1976) (citing cost of commuting and ordinary clothing as examples of expenses helpful and necessary to an individual's employment that are "essentially personal" and hence nondeductible), aff'd per curiam, 591 F.2d 1273 (9th Cir. 1978).

[*39] Petitioner contends that the submitted canceled checks as well as his testimony substantiate the expenses he reported on Schedule F for each year in issue. Before and during the course of the trial, however, respondent conceded the substantiation of additional expenses beyond those allowed in the notice of deficiency[10] and to the extent petitioner substantiated expenses related to the cutting horse activity.

Throughout trial and briefing respondent agreed to allow additional deductions pending the Court's decision regarding section 183. The Court has reviewed the testimony and other evidence petitioner submitted regarding additional Schedule F expenses reported and has considered respondent's challenges. The Court concludes that petitioner has substantiated expenses over

---

[10]In the notice of deficiency respondent disallowed all Schedule F expenses. Respondent adjusted miscellaneous expenses reported on Schedule A, Itemized Deductions, to reflect trade or business expenses and allowed the following amounts: $17,086, $18,936, $16,604, $10,833, and $10,607 for 2006, 2007, 2008, 2009, and 2010, respectively.

[*40] and above the amounts previously stipulated[11] and conceded by[12] the parties, in the following categories and amounts:

|  | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|
| Supplies | $739.05 | $3,200.95 | $581.64 | $243.41 | $846.65 |
| Feed and hay | 3,332.23 | 3,792.25 | 3,216.52 | 2,817.52 | 1,196.16 |
| Dues and fees | 7,825.22 | 3,697.07 | 2,247.74 | 1,376.00 | 4,613.36 |
| Contract labor | 308.00 | 537.50 | --- | --- | --- |
| Veterinary | 1,146.15 | 400.00 | --- | 1,691.50 | 1,779.57 |
| Repairs | --- | --- | 3,813.39 | 1,835.99 | 3,440.00 |
| Advertisement | 500.00 | 275.00 | --- | --- | --- |
| Training | 1,513.00 | 4,753.65 | 1,999.14 | 943.73 | 5,457.49 |
| Total | 15,363.65 | 16,656.42 | 1,858.43 | 8,908.15 | 17,333.23 |

[11]Before trial respondent conceded that petitioner is entitled to additional Schedule A miscellaneous expense deductions of $2,790, $227, and $3,311 for 2006, 2007, and 2008, respectively. After trial the parties submitted a third supplemental stipulation of facts agreeing to additional miscellaneous expense deductions as follows: $973.50, $946.50, $1,510, $4,023, and $2,826 for 2006, 2007, 2008, 2009, and 2010, respectively.

[12]Respondent agreed on brief that petitioner substantiated additional expenses of $3,960, $3,746, $1,510, $4,023 and $2,826 for 2006, 2007, 2008, 2009, and 2010, respectively, pending the Court's decision with respect to sec. 183.

[*41] Petitioner credibly testified to the business purpose for each expense and provided a list of canceled checks. The Court finds that petitioner purchased similar items each year from the same vendors and sufficiently described the manner in which he conducted business with vendors in his cutting horse activity. All expenses the Court finds to have been substantiated are expenses that respondent concedes cleared the bank, and each check was written to the named vendor on the specified date. The Court finds that any expenses that had both personal and business characteristics and the few items that were challenged as not clearing petitioner's bank account have not been substantiated.

B. Net Operating Losses

Petitioner bears the burden of establishing both the existence and the amount of NOL carrybacks and carryforwards. Rule 142(a); Keith v. Commissioner, 115 T.C. 605, 621 (2000); Lee v. Commissioner, T.C. Memo. 2006-70. The Court may consider facts related to years not in issue that are relevant to the claimed NOLs. Sec. 6214(b). The record is devoid of testimony and other evidence specifying the details pertaining to petitioner's NOL carryforwards from 2003 and 2005, and the Court is left with only petitioner's Federal income tax returns. Petitioner's tax returns set forth only his claim of the NOLs and do not reflect the details needed to establish his entitlement to those

[*42] NOLs, other than general statements about his seed business losses. See Roberts v. Commissioner, 62 T.C. at 837. Even though the returns are signed under penalty of perjury, the signatures are insufficient to substantiate the deductions claimed. See Wilkinson v. Commissioner, 71 T.C. at 639; Emerson v. Commissioner, T.C. Memo. 2001-186. The Court concludes that petitioner did not meet his burden of establishing both the existence and the amounts of the 2003 and 2005 NOL carryforwards.

IV.   Section 6662(a) Penalty

Section 6662(a) and (b)(1) and (2) authorizes a 20% accuracy-related penalty on any underpayment of Federal income tax attributable to a taxpayer's negligence or disregard of rules or regulations or a substantial understatement of income tax. "'[N]egligence' includes any failure to make a reasonable attempt to comply with the provisions of * * * [the Code], and the term 'disregard' includes any careless, reckless, or intentional disregard." Sec. 6662(c). Negligence is strongly indicated where "[a] taxpayer fails to make a reasonable attempt to ascertain the correctness of a deduction, credit or exclusion on a return which would seem to a reasonable and prudent person to be 'too good to be true' under the circumstances". Sec. 1.6662-3(b)(1)(ii), Income Tax Regs. For individual taxpayers there is a substantial understatement of income tax for any taxable year

[*43] if the amount of the understatement for the taxable year exceeds the greater of 10% of the tax required to be shown on the return for the taxable year or $5,000. Sec. 6662(d)(1)(A).

On January 19, 2018, respondent filed a motion to reopen the record to provide documentation related to section 6751(b).[13] Reopening the record for the submission of additional evidence lies within the Court's discretion. Nor-Cal Adjusters v. Commissioner, 503 F.2d 359, 363 (9th Cir. 1974), aff'g T.C. Memo. 1971-200; Butler v. Commissioner, 114 T.C. 276, 286-287 (2000). The Court will deny a motion to reopen the record where the evidence relied on is cumulative or would not change some aspect of the outcome of the case. Dynamo Holdings Ltd. P'ship v. Commissioner, 150 T.C. 224, 230 (2018); Butler v. Commissioner, 114 T.C. at 287. Petitioner objected to the reopening of the record for the submission of additional evidence. The Court will deny respondent's motion to reopen the

---

[13]With respect to an individual taxpayer's liability for a penalty, the Commissioner must produce sufficient evidence indicating that the imposition of a penalty is appropriate. Sec. 7491(c); Higbee v. Commissioner, 116 T.C. 438, 446 (2001). The Commissioner's burden of production includes evidence that the penalties were "personally approved (in writing) by the immediate supervisor of the individual making such determination". Sec. 6751(b)(1); see Chai v. Commissioner, 851 F.3d 190, 221 (2d Cir. 2017), aff'g in part, rev'g in part T.C. Memo. 2015-42; Graev v. Commissioner, 149 T.C. 485, 493 (2017), supplementing and overruling in part 147 T.C. 460 (2016). Because the Court concludes that petitioner is not liable for a sec. 6662(a) penalty, the Court does not address whether respondent met his burden of production.

**[\*44]** record because, as discussed below, the evidence relied on will not change the outcome of this case because petitioner acted with reasonable cause and in good faith.

The section 6662(a) penalty will not be imposed if the taxpayer establishes that he acted with reasonable cause and in good faith. Sec. 6664(c)(1). Circumstances that indicate reasonable cause and good faith include reliance on the advice of a tax professional. Sec. 1.6664-4(b), Income Tax Regs.; see Higbee v. Commissioner, 116 T.C. at 448-449. For a taxpayer to rely reasonably upon advice so as to negate a section 6662(a) accuracy-related penalty, the taxpayer must prove by a preponderance of the evidence that the taxpayer meets each requirement of the following three-prong test: (1) the adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment. Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002).

Petitioner meets the three requirements. He reasonably relied on his accountant, a CPA with 30 years of experience who had prepared petitioner's returns since the beginning of the cutting horse activity. Petitioner provided the CPA with the records he used to keep track of his income and expenses.

**[\*45]** Therefore, petitioner is not liable for an accuracy-related penalty for any of the years in issue.

The Court has considered all arguments made by the parties and, to the extent not mentioned above, the Court concludes they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>An order will be issued denying respondent's motion to reopen the record, and decision will be entered under Rule 155</u>.